**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 5 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

In re:

MIDGARD CORPORATION,

Debtor.

MIDGARD CORPORATION,

Plaintiff-Appellant,

v.

PAUL TODD, CUSTOM CUTTING
MILLWORKS INCORPORATED and
TODD'S RECYCLING CENTER
INCORPORATED,

Defendants-Appellees.

No. 96-6018
(D.C. No. CIV-94-1304-T)
(W.D. Okla.)

ORDER AND JUDGMENT*

Before PORFILIO, ANDERSON, and BRISCOE, Circuit Judges.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Debtor Midgard Corporation brought this adversary proceeding against defendants alleging that they committed several business torts against it that led to its filing for bankruptcy. After a trial, the bankruptcy court made oral findings of fact and conclusions of law and granted judgment in favor of defendants on all of Midgard's claims. The court also imposed sanctions under Bankruptcy Rule 9011 of $500 each against Midgard's attorney and its president for bringing an action not well-grounded in fact or law. (Imposition of these sanctions is the subject of separate appeals, Nos. 96-6016 and 96-6017.) The district court affirmed, and Midgard again appeals. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291, and apply the same standard of review as the district court; that is, we review the bankruptcy court's legal determinations de novo and its factual findings for clear error. See Phillips v. White (In re White), 25 F.3d 931, 933 (10th Cir. 1994). We also affirm.

The general facts are not in dispute. Midgard was in the business of recycling waste products, and its primary activity was grinding scrap wood and selling the resulting wood residue. In July 1992, it entered into a contract to

supply wood residue to Medite of New Mexico, Inc., a fiberboard manufacturer. Medite needs large supplies of residue to keep its plant operating and has contracts with a variety of suppliers around the Southwest. Its contract with Midgard did not mention anything about Midgard being an exclusive supplier of wood residue to Medite, but an October 1992 letter sent under the authority of Medite's raw materials manager, who had signed the July contract on Medite's behalf, allegedly gave Midgard "an exclusive on the market for this material in the Oklahoma City area." Appellant's App. Vol. I at 82.

Defendant Paul Todd was a part-owner of the other two defendants, which were located in the Oklahoma City area. Through its own operations, defendant Custom Cutting Millworks (CCM) generated a considerable amount of scrap wood. Prior to Midgard's existence, CCM had its own wood-grinding equipment and turned its wood residue into "artificial" fireplace logs or sold the residue to farmers. In late 1991 and 1992, Todd and Midgard's president, David Personette, discussed Todd's investing in or purchasing Midgard. Todd was informed of the allegedly exclusive arrangement Midgard had with Medite as well as various other aspects of Midgard's business, such as the names of at least some of its wood-scrap suppliers, its pricing arrangements with its suppliers and Medite, and equipment Midgard planned to buy to expand its capacity. Todd decided not to purchase or invest in Midgard but to expand his own wood-grinding operations,

eventually buying one of the same wood-grinding machines that Midgard had planned to buy. Though aware that Midgard claimed to have an exclusive arrangement with Medite in the Oklahoma City area, Todd entered into a contract with Medite in April 1993 to supply Medite with wood residue. Todd obtained wood scrap from some of the same suppliers that had previously sent their scrap to Midgard, on better terms than Midgard had offered them. In May 1993, Midgard filed for Chapter 11 bankruptcy protection, and in September 1993, brought this adversary proceeding.

Midgard's primary claim is that Todd tortiously interfered with its contract with Medite. Under Oklahoma law, a party claiming tortious interference with contract or business relations must prove that (1) it had a business or contractual right that was interfered with, (2) the interference was malicious and wrongful and neither justified, privileged, or excusable, and (3) the interference proximately caused damage. See Morrow Dev. Corp. v. American Bank & Trust Co., 875 P.2d 411, 416 (Okla. 1994). The bankruptcy court found that there was some doubt as to the validity of the exclusivity agreement and thus, whether Midgard had a valid contractual right that could be subject to interference. However, it did not have to resolve that issue because it found that Todd's actions did not constitute wrongful interference.

Todd testified that in February 1993, he called Medite's plant manager and inquired whether anyone had an exclusive contract for supply of residue in the Oklahoma City area. Todd testified that the plant manager replied that there was no exclusive contract and that such contracts were against Medite's policy. Todd and the plant manager subsequently negotiated a contract under which Todd would supply residue to Medite. Though the plant manager testified that he could not recall Todd's asking about exclusivity, the bankruptcy court specifically found Todd's testimony to be credible and found his subsequent negotiation of a contract with Medite simply to be permissible competition and not wrongful. See Overbeck v. Quaker Life Ins. Co., 757 P.2d 846, 849 (Okla. Ct. App. 1984) (holding legitimate competition not wrongful interference). This is a factual finding, see Jordan v. Shattuck Nat'l Bank, 868 F.2d 383, 387-88 (10th Cir. 1989), that is not clearly erroneous. Midgard's tortious interference claim therefore fails.

Midgard also claims that Todd misappropriated its trade secrets in violation of Oklahoma's Uniform Trade Secrets Act, Okla. Stat. tit. 78, §§ 85-94. To prevail on this claim, Midgard had to show the existence of a trade secret, misappropriation of the secret by defendants, and use of the secret to its detriment. See Micro Consulting, Inc. v. Zubeldia, 813 F. Supp. 1514, 1534 (W.D. Okla. 1990), aff'd, 959 F.2d 245 (10th Cir. 1992). For information to

qualify as a trade secret, it must not be generally known to or readily ascertainable by proper means to others who can obtain economic value from it, and it must be the subject of reasonable efforts to maintain its secrecy. See Okla. Stat. tit. 78, § 86(4); see also Central Plastics Co. v. Goodson, 537 P.2d 330, 333-34 (Okla. 1975). Whether information qualifies as a trade secret is a question of fact. See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc., 584 F.2d 946, 951 (10th Cir. 1978); Central Plastics, 537 P.2d at 333-35.

Midgard claims that the information it gave Todd about its operations and plans constituted a trade secret. Like the bankruptcy court, we are hard-pressed to understand what this secret information is. Midgard claims only generally that the secret is "the compilation of information as to [its] customers, suppliers, pricing and practices." Appellant's Br. at 34. As the bankruptcy court found, Midgard made no effort to keep any of this information confidential or to limit Todd's use of the information. Midgard admitted it told hundreds of people about its exclusivity agreement with its primary or sole customer, Medite. There is no indication that the names of Midgard's scrap suppliers were not "easily ascertainable by observation or by reference to directories." Central Plastics, 537 P.2d at 335 (further quotation omitted). Midgard complains that Todd bought the same piece of wood-grinding equipment that it was planning to buy, but this was an off-the-shelf machine advertised in trade publications. See id. at 334 (trade

secret "must contain elements which are unique and, not generally known or used in the trade"). We see no error in the bankruptcy court's finding that Midgard did not prove the existence of a trade secret.

Midgard claims that Todd breached his duty of good faith and fair dealing applicable to an alleged contract between Midgard and CCM. Though the bankruptcy court does not appear to have expressly addressed this claim, we may affirm the bankruptcy court on any grounds supported by the record. See Sampson v. Sampson (In re Sampson), 997 F.2d 717, 721 (10th Cir. 1993). Midgard contends that its "purchase [of] a load or two of saw dust from Custom Cutting," Appellant's App. Vol. II at 319, apparently under an oral agreement with no terms identified, somehow prevented Todd from dealing with Medite. The absence of merit to this vague, undeveloped claim is readily apparent.

Finally, Midgard claims the bankruptcy court was biased against it. We have reviewed the record and see no evidence of bias.

AFFIRMED.


Entered for the Court


Stephen H. Anderson
Circuit Judge